Thank you, Your Honor. May it please the Court, Daniel Tenney for the United States. As the Ninth Circuit and Fourth Circuit have already recognized, a stay of the injunction of the rule at issue here is warranted. We respectfully disagree with the Ninth Circuit's conclusion on standing, but the Ninth Circuit otherwise correctly reasoned that the rule is a permissible interpretation of the public charge statute and is not otherwise prohibited. As the Ninth Circuit recognized, the term public charge is ambiguous, has not been given a fixed definition by Congress, and the main consistency over the years has been that the executive branch has been given discretion. I have a couple of problems with the merits. I'm not saying that you ultimately won't win, but the question is, is this in doubt? The Ninth Circuit treated it as being perfectly obvious, and I have a couple of doubts. One is, I take it that the idea is to deal with long-term charges, not emergency situations. Is that right? It's definitely not emergency situations. I mean, it has to be sustained. It's long-term is maybe Well, yeah. I mean, the cases on that are not all that definite in the history. But if it isn't an emergency situation, why this notion that if you use more than one of the listed dubious charges, that each one counts as a month? That seems to be, at least, there is an argument that that is irrational, because if somebody has an emergency crisis because of which he or she has to use all of them in one week under the rule that has been set up, that makes the equivalent of the 12 months. And that doesn't seem to me to make much sense. Two responses to that. First, just directly on that point, I mean, what the agency explained is that it's trying to measure the degree of dependence on public benefits as opposed to one's own resources. And they didn't want very short-term, you know, use of a single benefit to count. You know, so, and there are some benefits that are in emergencies that are excluded entirely from the rule, like emergency Medicaid. So that's, but the agency concluded that a person who is relying on multiple benefits at the same time is more dependent on public resources than And maybe the notion that you say the more of ones, each counts as if it is a month seems to me a bit odd. The other thing that frankly seems a bit odd is all these very, very desirable exemptions for kiddies, you know, all the things that say that minors and so on, that may be a desirable thing in some way, but how does that go to the issue of whether these are long-term or serious, likely to be charges on the state? That is, it looks to me more, at least the argument could be made, that what is going on here in the merits is a decision of which charges you want to be for and which charges you don't want to be for. And that's harder to put together with the basic statute, which talks about charges. Now, I'm not saying that these exemptions aren't ones that are desirable, but it casts enough doubt so that I'm a little uncomfortable with saying it's a clear thing, as Vinay Circuit said. Okay. If I could circle back to my second response to your earlier question, or I can answer this one first, whichever you prefer. The other thing about the emergency situations is this is a prospective inquiry. The question is whether you're likely at any time to become a public charge in the future. So, you know, if there is some, you know, obviously the person who's making this determination isn't going to know that there's going to be some catastrophe that's going to lead to your being on all of these benefits. So as a practical matter, it's not clear that the issue that you raise, and the agency explained that, you know, when it's looking backwards, it will look at the circumstances. It's a totality of the circumstances inquiry and the fact that you've used the benefits. So if, for example, you know, you had a fire in your house and you used a lot of benefits in one week and then you recovered, that would be taken into account in the totality of the circumstances, and they wouldn't label you likely to become a public charge in the future. So the issue that you raise is that you're not likely to become a public charge in the future. Scalia. Although it is pretty clear that if you use the 12-month thing, you're in trouble. I mean, practically speaking, if you have the 12 months in the three years, that pretty well does it, doesn't it? Feigin. Well, no. I mean, they were actually quite specific about this. They addressed this in the final rule. I can get the page number for you if you want. And what they said was they would look at the circumstances, and the example they gave, it's different from the one you gave, but it is an example. If you use the 12 months, but you had, for example, a very low benefit amount, you know, but sustained, and then you came off of the benefits and there was no indication that you would need to go back on, that person wouldn't be likely to become a public charge, even though in the past they had used 12 months in a 36-month period. So just, I mean, the whole thing you have to keep in mind that it's a totality of the circumstances inquiry. It's not saying that any single factor necessarily means that in the future you are likely to use benefits at this level. To get back to your next question, I mean, the agency explained why, you know, for children in benefits or even sort of use of benefits is less probative because, you know, kids aren't expected to work and support themselves when they're kids. And... Well, but it is their parents. And if you're looking to whether parents are likely to be charges if they are in situations where they need to do things for children, that is, and are not able even to do those, that seems to me highly predictive of who becomes charges. Now, mind you, I'm not saying the merits will come out one way or another because that isn't what we can decide today. And I've been sitting here for 25 years, I've seen too many of these cases where when they come up on a preliminary basis, we think it's going to go one way and then when the merits are finally argued, it goes the other way. I'm just asking as to whether the thing is clear or whether there are doubts. I understand, Your Honor. I mean, I will note that the points that you're raising here are not the grounds on which the district court decided the case, which... I understand that, but that doesn't really... Well, we submit that the district court made some errors that we've identified in saying that there was a clear meaning of public charge, you know, going back over the unambiguously foreclosed from taking the approach that it took. That's the holding that we're challenging here. That was the basis for the court's injunction. And we submit that that was an error for reasons largely explained by the Ninth Circuit. And... So I'd like you, if I could interrupt for a minute here, I'd like you to address our procedural posture. Ordinarily, we look at stays to preserve a status quo. You're asking for a stay to allow you to allow the government to implement a major change in the rules that govern the application of the public charge statute, if you will. We have a briefing schedule that is set up so that your reply brief is due on February 14th, with just a little over a month from now. And in the ordinary course, on an expedited briefing schedule, you'd be arguing the merits of this, maybe within a month after that. Why should we break from our standard process, absolutely clear abuse of discretion, where we have complicated questions about the merits of this new rule, which everyone agrees, I think, represents a step away from where the government has been for years, where there are interesting and somewhat complicated, in fact, heavy-standing questions where, to my reading, the question of irreparable harm is, you know, very uncertain. Why shouldn't we take this in the ordinary course and study it and have a merits panel adjudicate this with the benefit of full consideration? I think your question largely goes to the nature of the harms to the government. A stronger harm to the government would give a stronger reason to issue a stay, which we recognize is, you know, is an extraordinary relief. I mean, but what's happening here is that the political branches and the executive branch in particular in this context have been charged with making determinations about which aliens should be admitted to the United States and the circumstances under which they should remain. And as we've explained, and I don't think this is seriously disputed, the decisions that will be made while this appeal is pending will grant permanent status to a number of aliens, and there's not currently a mechanism to revoke that. It makes grants some aliens legal permanent residence, but they cannot get charges, they cannot get these benefits for five years, and if they become charges, they can be removed, can't it? In many cases, but not all cases, they can't get the benefits for five years, that's correct. The removal for public charge requires a set of additional considerations. Has there been a declaration of an emergency by the president or by anyone which says that this has to come into place immediately? One of the things that interests me, I mean, obviously, if the government says it's an emergency, we have to take that very seriously, even for a short period of time, but has there been any such statement here? No, Your Honor, there's not a declaration of an emergency. I mean, there is a weighing of the harms to be done. Of course, of course. And I guess the other point I would make on this point is... So you're saying it's irreparable harm because some people will be admitted under the old rule, which has been in effect for decades, and not the new rule over a period of a couple of months. Is that right? I mean, it's likely to be more than a couple of months, assuming the court takes time to write an opinion, but... Sometimes a decision, if there is an emergency, can be announced and opinion will be issued thereafter. Right. I mean, I think the fact that it's permanent, the fact that it's in interference with the determinations about who should stay in the country, which is a core executive function. And then the other point I'd like to add to this, which I think is critical here, the district court here issued a nationwide injunction. So even though the Ninth Circuit, you know, this court can balance the factors and this court can conclude whether it thinks injunctive relief is appropriate. The Ninth Circuit's already done that. The Fourth Circuit's already done that. But those rulings don't have effect because this court, I mean, the district court in this case concluded that its ruling should govern not only in New York and Connecticut and Vermont, but also in Montana and Idaho. That's a very serious question, and I'll have some questions for the other side on that. The argument that is made is that it has nationwide effect, but I take it you're saying that these plaintiffs don't really need a nationwide injunction. I don't... Our position is that the State of New York does not need an injunction covering an alien in California, and that the fact that the... I think they'd be talking about New Jersey, not California, but I know where you're going. Well, but their injunction doesn't only go to New Jersey. It goes to California. I don't think they need New Jersey either. We have the Seventh Circuit denied a stay, and was the district court decision in the Seventh Circuit a nationwide injunction as well? It was not, Your Honor. It was limited to the State of New York. The district court there concluded that the harm to the plaintiff in that case could be remedied by an injunction limited to the State of Illinois. And so, I mean, we think obviously the injunction should be stayed in its entirety, but at a minimum, the nationwide aspect of it... Could you tell me whether when we look at that, we look at the harm to the plaintiffs, that is, to the State of New York and to the non-for-profits, or we also look to the harm to the aliens who are not admitted or not? I didn't see that much discussed, but in general, when we're talking about irreparable harm, what is it that we look to? Do we look to the parties before us, which normally we would do, or are we supposed to look more broadly? The basic principle is that an injunction should be no more intrusive to the defendant than necessary to remedy the injuries of the plaintiffs. You come to court and you say, I have these injuries and I want the court to remedy them, and then if you can demonstrate... I'm not... We're not saying there can never be a nationwide injunction. If a plaintiff comes in and says, my injury isn't going to be redressed unless I have an injunction that covers Idaho... And on the question of nationwide injunction, we should look to the injury to these plaintiffs, not to the people whom they are trying to protect. That's correct, because they don't have standing to represent aliens in other states. And I think that the way this particular set of cases has played out is illustrative of the reasons for that. If California filed its own lawsuit, and so did Washington, and the Ninth Circuit has held that a stay of the injunction there is warranted and that the rule should go effect in those states. The idea that the government has to win every single case in order to implement its rule everywhere, while the plaintiffs just have to win one case somewhere. And even though their harms are remedied by a more narrow injunction that the plaintiffs would get of an injunction that... Your argument makes logical sense. And nationwide injunctions are obviously problematic from any number of perspectives. But there is a question of workability of a stay that is limited to... Or any limitation imposed on the district court's decision that's limited to the circuit's to... Geographically, the organizational plaintiffs here, where we define they had standing to pursue this suit, sufficient to sustain the injunction, serve people who are outside of the circuit. And people move, obviously. And it seems to me that it might be a better service to the government and to the parties to render a decision on the merits soon, rather than to look for a way to set up some kind of administrative structure that would give meaning to the nominal announcement that the injunction is here forth limited to the states in this circuit. Do you have any response to that? Is that incorrect? Well, I guess in terms of administrability, of course, executive agencies, if they get an injunction limited to a particular jurisdiction, can decide whether they want to voluntarily comply more broadly for administrability purposes. In terms of the harms to the plaintiffs here, you know, obviously we don't think that they have standing. But the state plaintiffs' alleged injuries are that the individuals within their state will consume fewer... Will get fewer public benefits that would flow to the state coffers, or that will trigger, you know, other problems within the states. There's no showing that in order to remedy that injury, you need an injunction that applies to people who live on the other side of the country. And similarly for the organizations, almost all of the organizations do operate locally. There's one of them that says it has affiliates that it provides funding to, but to remedy their injuries, assuming, again, that these plaintiffs have standing at all, which we dispute, one would need an injunction that extends all the way across the country. And certainly if you were doing a balancing of the harms, even if you thought they had... But what about the people who were moving? What if you get benefits in New Jersey as well as in New York, or only in New Jersey, but you live in New York through some kind of housing arrangement? You work in New York, you live in New Jersey, you're in Section 8 housing. I mean, that to me just suggests that there would be a lot of administration that would need to be set up if we were to try to limit the injunction, the district court's injunction to the circuit. And that it would take longer to do that than it would simply to turn to the merits of your standing arguments and other arguments and render a decision. Do you think that's unrealistic? I guess I don't think that... I think that if you said that it applies within this circuit, there might be a handful of edge cases where people were moving around that would have to be about the Western... Your argument would be that in terms of harm, even if a few people rushed into New York from other places to take advantage of things here, that that is not going to be irreparable harm. Sure. And also, of course, they would be doing so to take advantage of a stay or of the limitations on a stay. And of course, as this court has pointed out on the merits, it could turn out that the government prevails everywhere or the plaintiffs prevail everywhere. And then, so the idea that people are going to be moving around a lot for this interim period doesn't create the same problems as saying that you could make an argument like that in every case and just say, okay, well, it's going to be tricky to figure it out. I mean, we have here the advantage that the plaintiffs are in fact states and they happen to be the states of this circuit. So it's actually easier than usual to craft a narrower injunction. Again, we submit there shouldn't be an injunction at all, but at a minimum. Of course, there are the other plaintiffs as well. But if you'd like to make just a closing statement before we hear from the states, feel free to take it. Well, just as to the other plaintiffs, they haven't demonstrated that they have harms extending across the country. You know, they cited one declaration that said that there are affiliates, one of the plaintiffs has affiliates and provides some funding or services to these other people. The idea that even if you thought that was sufficient for standing purposes, if you're weighing the harms to them from the indirect effects of the rule going into effect on the other side of the country against the harms to the government, that shouldn't be a close call. All right. Thank you very much. Thank you for your argument. We'll hear from the states. You can also adjust the podium if you'd like to lower it. May it please the court, Judith Vail for the states in New York City. A stay would improperly upend a status quo that defendants admit has lawfully governed public charge determinations for at least two decades, though really it's been over a century. But a stay is supposed to do the preserve the status quo. It's supposed to prevent that kind of disruption and harm of having very drastic changes go into effect now, only to have it all maybe go back the other way if the merits panel reinstates the preliminary injunction. Now, my colleagues representing the private plaintiffs are going to focus on why disrupting the status quo will cause irreparable harms to the plaintiffs and the public and why that feeds into the scope of the injunction. And I'd like to turn to why will unlawfully upend the well-settled meaning of public charge and is thus likely contrary to law and arbitrary and capricious. But if we agreed with the Ninth Circuit that you were going to lose the case because there really is nothing to it, if we were to agree with that, then wouldn't that be reason enough for granting this stay? No, Your Honor. You would still have to look at the equities and the extreme level of irreparable harm to the plaintiffs and the public and the lack of any such harm to defendants. But also we think the Ninth Circuit got it wrong and that there are at least very serious questions about the rule being contrary to law and arbitrary and capricious. Since Congress first used the term public charge, it has always meant the truly destitute, individuals who are unlikely to subsist without relying primarily on the government for the long term, not for the short term, not for some sort of emergency. And it's never meant people who actually have jobs, who earn a living, who might at any point in their entire lifetime temporarily use any amount of supplementary benefits. When this law was first put in, at a time when people were talking eugenics and all sorts of rather horrible things, the position of the government was from your standpoint, and I should say from mine, far worse than what has been done now. What happened afterwards were some regulations which changed that to what I would think would have been a much more sensible than the original law. But if you look at the original law, it's quite hard to say that what they are doing now isn't consistent with what that rather dreadful original law was, isn't it? I think there are certain principles you can take out of the original law that do still apply today, although benefits have modernized in some way. It still has always meant, since the beginning and through till today, people who are unlikely to subsist without substantial government assistance in the long term. And where the Ninth Circuit really went wrong is in two ways, in thinking that the matter of B case somehow changed everything, and in assuming that using minor amounts of supplementary benefits is the modern equivalent of being in an almshouse or of being unable to care for yourself. But of course here we're on review of a preliminary injunction. We're not getting to the actual and whether substantial questions are raised. And the meaning of public charge has changed over time. Everyone agrees to that. It's not been static. It may have been reprehensible or raised moral concerns for some people at the beginning, but it's changed over time. And its meaning and administration is committed to the government, which has plenary authority, the executive branch over immigration matters. Why shouldn't the government be entitled to change that meaning or to reinterpret the phrase public charge in accordance with that discretion that is committed to it by Congress in accordance with its responsibilities? Well, they do have some discretion, especially in individual cases, to apply the term. But I don't think that the term, yes, there's some ambiguity or flexibility, but I don't think that the core meaning has changed over time. If you look from 1882 through 1952 when the INA was public charge, again, without changing it, it has always focused on people who are truly destitute for the long term, not for the short term. For example, hasn't it in the past sometimes meant that a person is a public charge if they receive housing, if they are living in an almshouse, whereas one of the objections made to the new rule is that it goes from cash benefits to looking again at the provision of housing. I mean, there are elements that have come and gone in that capacious term over time. And I take it you would say, is it part of your argument that the government, while they may have discretion in interpreting the phrase public charge, its discretion ultimately is limited by the history and the positions it's taken over time? Yes. Well, yes, we would say that they have some flexibility and discretion here, but they have gone so far outside of the bounds of what the historical meaning of this term has always been and how Congress has always understood it, that this goes past the breaking point of such ambiguity. And it's true that almshouses used to be the sort of flash point for public charge, and we don't have almshouses anymore. But it is not the state, that doesn't mean that it's logical to say that using any amount of these type of supplementary benefits makes you a public charge. And that goes contrary to how Congress has set up these programs, the benefit granting agencies with expertise have said about these programs, and the reality of these programs. I mean, to give you a sense of who... You're saying that their likelihood of success on the merits is actually very low. And so they would need to show, so that in itself would disentitle them to a stay right now. Is that what your position is? Yes. We think their likelihood of success is low. And especially since we're here on a stay, when they carry the burden, and not on the merits, which we'll get to fairly quickly. And to give you a sense, I think, of just how far past the breaking point this is, and why we do not think it's clear as the Ninth Circuit seemed to think, I mean, more than 40% of U.S.-born citizens used one of these supplementary benefits between 1997 and 2017. In New York City, 40% of the city population is on Medicaid, and 20% uses SNAP. And in the plaintiff states, over 60% of people who use Medicaid work. For Section 8 in New York City, you can initially qualify if you have over $53,000 a year in income, and you can keep that benefit if you have over $80,000 a year in income. And what this shows is just that these benefits are categorically different from OMS houses, institutionalization, or cash assistance, which is a more modern equivalent. Things do change, but we do have programs that provide basic subsistence to folks who cannot survive without it. But so much on this depends on how much Chevron deference we are expected to give. And Fox says that, in effect, the fact that politics have changed, and that an agency now has changed its view, not because of its expertise, but because of a political difference, doesn't make any difference. We still have to give deference. Now, my question is, to what extent are we, in looking at the ultimate success of the merits here, allowed to consider that this view of Fox has been questioned by some of the newest justices of the Supreme Court? That doesn't affect us on the Second Circuit, but it does affect the ultimate merits which go to the Supreme Court. Justice Gorsuch has made very clear that Fox doesn't make any sense, as far as he's concerned. Do we take that into account? Well, I do think there is, you can look at this case, also, even if you're looking through the lens of the agency has gone so far outside and is really upending a careful balance that Congress struck in immigration law in a very major way. And that's not the kind of decision that Congress would have silently passed on to the agency through sort of implicit hidden meanings. And, I mean, Congress, especially in 96, struck a very careful balance. It used very specific provisions about benefit access and affidavits of support when it wanted to do things about immigrants who are here in the country already in benefits. And what it didn't do is it didn't go any further. It decided not to go further. It decided not to change public charge, even though it was fully aware of the history and regulatory practice over that term for over a century. And so when Congress has set up a very careful balance, you know, even under Chevron, we do not say that an agency can just undo what Congress has done. And they have gone so far here, especially considering that Congress actually rejected in 96 a transformation to the definition of public charge that's actually very similar to what they're trying to do here. And so I think this is starting to go to a place that is so far beyond discretion that it is outside of Chevron. And if I could turn to the arbitrary and capricious for a minute, even if you put contrary to law aside, there are several aspects of this rule that are also just arbitrary and capricious. The timing stacking system that Your Honor mentioned is one of them. I mean, the rule purports to take the 12-month threshold so that agency officers will be using a threshold that exceeds, quote, a level of support that temporarily or nominally supplements an alien's independent ability to meet his or her basic living needs. But then the stacking system does the exact opposite. It makes it so that if someone is going to, is likely at any time in their life to temporarily use benefits for just four months, but they used three months because they had a, you know, three benefits because they had an emergency or a sudden job loss, suddenly they're likely to be a public charge. And that is irrational. Agencies are allowed to pick lines that are not always perfect or not always scientific, but having picked 12 months as the line between long-term and short-term, it doesn't make any sense at all to suddenly shorten it for no reason at all. Thank you very much. Thank you. We'll hear from the organizations. Good morning, Your Honors. Jonathan Hurwitz from Paul Weiss on behalf of the Plaintiffs in the Make the Road case. I'd like to follow up on three points that were the subject of discussion earlier. First, the question of irreparable harm to the government. There's no showing of irreparable harm to the government here. What the preliminary injunction does is simply require the government to continue the status quo, processing green card applications exactly the same way they've been doing for the past 20 years. But what is really the irreparable harm to your clients, to the plaintiffs? I'm not talking about the aliens for whom there clearly is irreparable harm, but they're not before us. But what is really the irreparable harm in a few months to you, the state of New York, or these agencies? What is it? I'm happy to address that, but I do want to say that the harm to the non-citizens is also very relevant to this consideration. How can we take that into account if they are not parties to the case? Because one of the factors that the court has to consider, of course, Your Honor, is the public interest, and part of the public interest— Oh, that comes in under public interest generally. So that becomes not so much irreparable harm, but public interest because of irreparable harm. But there, then, the government says the interest in the government to be able to govern. So that's where that comes in on the question of the broader issues. Yeah. Okay. That is what the government says, and the government also acknowledges that on the side of the non-citizens you have hundreds of thousands of people losing benefits. You have, well, health insecurity, nutritional insecurity, and the like. So those—I don't think that the public interest weighs—I think the public interest clearly weighs in favor of continuing the injunction. But to answer the question Your Honor asked directly, the harm to the organizations, as the district court found—and I don't think factually this is disputed—is it drains them of their resources. They're required to expend resources on addressing the fallout from this rule. It interferes with their organizational missions because it prevents them from doing work that they would otherwise need to do. And as a concrete example of this, several of the— That's exactly correct, Your Honor. That's exactly correct. And as a concrete example of that, for example, several of the organizational plaintiffs provide legal assistance to immigrants in a variety of ways. And they've testified, and it's again uncontested, that by providing—that the rule requires them to expend greater legal resources to assist people with status adjustment applications because they've become both much more complicated and much more fraught. And as a consequence, the organizations are unable to assist other people with asylum applications, visa applications, defensive removal proceedings, or for other reasons. So it has a very concrete—it has a very concrete impact on the organizations. And it's irreparable because—in part because they can't assist those people later on, and also because, as again the affidavits show, a lot of what's going on here is people in immigrant communities are responding out of fear and confusion about exactly what's happening with this rule and what the impact— Assuming we buy everything you say, which is a dangerous assumption, but why should that justify a nationwide injunction? Well, the district court found that a nationwide—a couple of reasons. One, the district court found that the nationwide injunction is necessary to give the plaintiffs complete redress. The plaintiffs here, the organizations operate without regard to residents. One of the—one of the plaintiffs operates in 49 states in the District of Columbia. Clients, of course, move from state to state, so people who are in New York, for example, and they're concerned about their immigration status and whether accepting or not accepting a particular public benefit will affect their immigration status and maybe thinking about moving to New Jersey. Could we be affected by the fact that in the Seventh Circuit, the request of a—similar plaintiffs, after all—was only for Illinois and that one of the two district judges in the Ninth Circuit, who were reversed but who originally granted an injunction, believed that a local stay, a local injunction was sufficient? Is that something we can consider or not? Well, Your Honor, I can certainly consider it, but I submit that the findings here, based on the evidence about these organizations and the state and city plaintiffs in these cases, is what's most compelling. And the evidence here is that they do need a nationwide injunction. The other point I want to mention about that is the APA itself expressly authorizes the Court to delay the effective date of an agency action. It directs the agency, the Court, to set aside unlawful agency action. Having different rules for issuing green cards in New York and New Jersey is both irrational and, as I think Judge Carney pointed out earlier, just a recipe for confusion. Well, there's no doubt that differences is less desirable. On the other hand, if we get to general desirability, the question of the desirability of nationwide injunctions and people going to Texas or someplace else or here and forum shopping is something that we really have to take into account, too, don't we? Well, I think, you know, I don't think there's any suggestion of forum shopping here. The States... No, I'm not suggesting that there is, but just on the general question of how we weigh harm when we consider a nationwide injunction is against a local injunction, aren't we, shouldn't we take into account both some of the desirabilities of nationwide, that it doesn't mean diversity, but some of the undesirability that it does encourage forum shopping? Certainly, I think the Court has to consider those things, and it has to consider those things in the context of whether or not the district court here abused its discretion. I don't dispute that all of those things have to be taken into account. And also, right now, we have the Ninth Circuit and the Fourth Circuit going the other way with respect to the stay or granting the stay as requested by the government, the Seventh Knot, and it seems maybe unseemly to allow our circuit to have a nationwide injunction that impinges on those circuits. Well, I'm not sure it's unseemly, Your Honor. I mean, I think, Your Honor, this Court has to the district court entered a nationwide injunction. Nationwide injunctions are certainly permitted, and I think it's appropriate for this Court to consider the question for this Court, really, is whether or not the district court abused its discretion in entering a nationwide injunction here. And that, of course, was not in the context of there being other cases in other circuits. I do just want to come back to the harm to the plaintiffs here and the harm to the general public. Again, it's completely conceded that there's enormous, or certainly uncontested, that there will be enormous harm from this rule in immigrant communities which our organizations serve and which the states and the cities also serve. That's admitted by the government. It's shown by a range of — Well, does the government characterize it as harm? I mean, it's a change in the process. The government says that the rule will cause hundreds of thousands of noncitizens to forego benefits to which they are lawfully entitled. The rule acknowledges that it — the government acknowledges in the rule itself that the rule will lead to, I'm quoting, worse health outcomes, increased use of emergency rooms, increased prevalence of communicable diseases, increases in uncompensated care, increased rates of poverty and housing instability, reduced productivity and educational attainment, among many other things. And you're quoting from what? I'm quoting from the rule itself. That's at 83 Federal Register at 51-270. So I don't know whether the government would characterize that as harm, but it sounds like harm to me. And there's — And the comments — I think you wrote that the comments were predominantly adverse to the rule. Is that right, the comments received? We said that, and the government acknowledges that. The rule itself acknowledges that the comments were overwhelmingly in opposition to the proposed rule. That's correct. Although, of course, that doesn't mean that they were — that the rule is unlawful. By itself, that's correct. But it's some evidence, together with all of the other evidence that was in front of it. Can you address the irreparable harm that the government claims would be done to it, specifically legal permanent residents who get legal permanent residency and the government says cannot then be removed if they become — Yeah, that's — happy to address that. I think, to be clear, as Your Honor said, there's no claim here that there's an emergency and there's an express concession by the government that the current rules of 1999 field guidance are lawful. So what the government is saying is simply that because it is being impeded in pursuing a rule that it wants to implement, that it's being irreparably harmed. I don't think that's the law, and that really would prove too much. And anyone who becomes — who gets legal permanent resident status during the pendency of the injunction is certainly subject to the same stringent requirements for obtaining public benefits that anyone else is. They have to have an affidavit of support. There are strong — stringent restrictions on the availability of public benefits for noncitizens under the Welfare Reform Act and other laws. And as Your Honor pointed out earlier, in some cases they're subject to public charge removal. And all of those things are the same set of rules that have been in place under the current administration for the last three years and under many — multiple prior administrations since at least 1999. Thank you. Very good. Thank you very much. Thank you for your arguments. We will reserve decision. We'll try to get your decision promptly. Well argued by both sides. Thank you.